THE CITY OF HARVEY, Plaintiff-Appellant, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES (AFSCME), Council 31, Local 2404, Defendant-Appellee.

First District (5th Division)   No. 1—01—1354

Opinion filed August 16, 2002.

Marc R. Jacobs and Jeremy J. Glenn, both of D'Ancona & Pflaum, L.L.C., of Chicago, for appellant.

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for appellee.

JUSTICE REID delivered the opinion of the court:

The appellant, the City of Harvey (Harvey), appeals the trial court's order which granted the defendant's, American Federation of State, County and Municipal Employees (AFSCME), Council 31, Local 2404 (Union), motion to confirm an arbitration award. On appeal, Harvey maintains the trial court erred because the arbitration award:

(1) should be vacated on the grounds that the arbitrator did not have proper jurisdiction over the matter, and (2) violated public policy which mandates that an employer provide a safe workplace for its employees and eliminate known dangers. For the reasons that follow, we affirm the decision of the trial court.

## BACKGROUND

This matter involves a Harvey employee who was terminated following an incident in which he allegedly made threatening remarks to his supervisor. The employee was a member of the Union. The Union and Harvey were parties to a collective-bargaining agreement that governed the employee's employment. An expedited grievance was filed on the employee's behalf protesting the discharge, and the dispute was arbitrated pursuant to the collective-bargaining agreement. At the arbitration hearing, Harvey raised a procedural and substantive issue regarding the form and content of the grievance. After hearing the dispute, the arbitrator found that the employee was removed without just cause. Harvey subsequently filed suit in the circuit court of Cook County and moved to have the arbitrator's award vacated. The Union responded to the suit and moved to confirm the arbitrator's award. The trial court denied Harvey's motion and confirmed the arbitration award. Harvey now appeals the trial court's decision confirming the arbitration award.

## THE FACTS

The grievant, Dale Stokes, was employed by Harvey, which is a municipality in southern Cook County, Illinois. Stokes was first employed as a laborer for Harvey's street department in 1986. During his employment and at the time of his discharge, Stokes was a member of the Union. Harvey and the Union were parties to a collective-bargaining agreement (CBA) that governed the terms and conditions of employment for certain Harvey employees, such as Stokes.

On September 30, 1999, while Stokes was at work, a fluorescent lightbulb burst, releasing filaments that precipitated him having an asthma attack. Stokes informed his supervisor, Russell Knaack, of the situation and requested permission to go to nearby Ingalls Memorial Hospital (Ingalls Hospital) because he was having trouble breathing. Knaack granted Stokes permission and asked him if he needed a ride to the hospital. Stokes told Knaack that he did not because his mother was coming to pick him up.

Later while at Ingalls Hospital, Stokes, who was concerned about whether worker's compensation would cover his medical expenses, requested that hospital staff members telephone Knaack to seek approval for the hospital visit under worker's compensation. The hospital

staff made two telephone calls to Knaack, and each time, Knaack informed the hospital staff members that he would not give such approval, instead telling the hospital staff members that they should call Harvey's city hall to seek such approval.

Consequently, Stokes asked his mother, Pauline Stokes (Mrs. Stokes), to go and speak with Knaack personally to clear up the matter. Mrs. Stokes went to the street department facility and had a discussion with Knaack. There are two rather different versions of the content of this conversation that came out at the arbitration hearing.

Mrs. Stokes testified that during the meeting she asked Knaack why her son's visit to the hospital was not covered by worker's compensation. Mrs. Stokes said that Knaack responded in an outburst by saying, "It's not job related and I'm not gonna okay it. If you want to get it okayed, call the mayor." When asked, "What do you mean in an outburst?" Mrs. Stokes replied, "He just screamed out. You know, hollered out and says, 'I'm not gonna do it, I'm not gonna do it. If you want to, call the mayor. I'm not going to do it.' And he said, 'It's dust all over the world.' "

Knaack denied making these comments to Mrs. Stokes. Knaack testified that he simply replied that the hospital visit was not covered under worker's compensation and then turned and walked away from Mrs. Stokes.

Mrs. Stokes's testimony concerning what occurred next follows: "I says, 'well, I'm not a child.' And I walked away. I said, 'I'm 73 years old. And I stood there for a minute because I was upset. And then I said, 'Well, what do you have to do, die on this darn job?' And I walked out. That was it."

Mrs. Stokes returned to the hospital and told Stokes about her meeting with Knaack. Stokes stayed at the hospital receiving treatment and medication until 2 p.m., at which time Stokes left and returned to work to fill out a report for worker's compensation.

The arbitrator's recitation of Knaack's testimony concerning the next sequence of events follows:

"At around 2:00 o'clock in the afternoon, Stokes came walking into the shop. He was walking rather briskly and hollered something which Knaack could not make out. He walked toward Stokes and Stokes walked toward him. Knaack asked Stokes 'What did you say?' Stokes said, 'After work, you and I are going out in the salt bin.' (Upon being questioned further, Knaack said [the salt bin is] a place in the Street Department where employees go to physically settle their differences, to fight.) With that Knaack said, 'Are you threatening me?'

At that point, Knaack testified: 'He ran right up to me, he

bumped into me, and he says "if you ever disrespect my mother again, I'm going to kill you." And he was right in my face and he bumped into me. I kind of stepped—or I went back a little, and I put my left arm up for some separation between him and I. And at that point, another employee, Cleo Thurman, grabbed him and picked him up and apparently carried him back to the parts room.'

Knaack continued his testimony, saying he went back to his office and asked a secretary to call the police and told her [of] the problem. As he walked back to the bench, past the parts room, he saw that Thurman still had a hold of Stokes, had him up in the air. As he went by, he heard Stokes say, 'I'm going to kill that mother-fucker.' "

Stokes denied ever threatening Knaack. Stokes did admit to telling Knaack that he didn't like Knaack disrespecting his mother. Stokes also testified that Knaack bumped into him, and he responded by saying, "Russ, don't push me." After asking Knaack not to push him for the second time, Stokes said, it was at that point that Cleo Thurman came and separated the two men. Stokes also testified that he remained in the parts room for approximately 10 to 15 minutes until he calmed down.

On October 1, 1999, Knaack attempted to conduct a preliminary hearing with Stokes as required by the CBA. Stokes refused to attend the meeting and also refused to sign a predisciplinary form. Knaack subsequently issued a 29-day suspension to Stokes. On October 1, 1999, Knaack also wrote a memorandum to the mayor of Harvey, wherein he recommended that Stokes be discharged. On October 11, 1999, Harvey terminated Stokes's employment.

Stokes was later arrested and charged with battery, assault and disorderly conduct as a result of the incident. A trial was held on January 25, 2000, and Stokes was found not guilty on all charges.

On October 15, 1999, Stokes and the Union filed a grievance. Harvey responded to the grievance, maintaining the document that Stokes submitted did not constitute a valid grievance. On June 22, 2000, the parties participated in an arbitration hearing before George Squillacote. On August 30, 2000, Squillacote issued his findings.

Initially, Squillacote decided that he had proper jurisdiction over the matter. Squillacote's findings as to jurisdiction follow:

"A look at the grievance will show one omission—it does not specifically state what is being grieved. The city argues that this is a fatal flaw leading to the lack of arbitrability. However, I would find that under the circumstances here, it was clear what the grievance concerned. The grievance was filed by Stokes just four days after his discharge. What else could it concern but that discharge? And obviously, it relates to the just cause provision of the CBA.

Also, Stokes filed the grievance at Step 3, pursuant to the 'Expedited Procedures' article of the CBA and the grievance specifically indicates it is being filed at Step 3. Thus, he did not have to use the form referred to in the CBA for Step 2 grievances. And that also shows the grievance concerned Stokes's discharge—as discharges are permitted to be filed at Step 3.

Accordingly, I find that a proper grievance was filed here—and timely filed—and accordingly the matter is arbitrable."

Squillacote then went on to find that Stokes had been terminated without just cause. Harvey was ordered to allow Stokes to return to work. However, Stokes did not receive back pay and was ordered to serve a 60-day suspension.

On November 2, 2000, Harvey filed a complaint pursuant to the Illinois Uniform Arbitration Act (710 ILCS 5/1 *et seq.* (West 2000)) as authorized by section 8 of the Illinois Public Labor Relations Act (5 ILCS 315/8 (West 2000)) to vacate the arbitration award. The Union then filed a motion to confirm the arbitration award. On February 14, 2001, Harvey filed a motion to vacate the arbitration award in response to the Union's motion. The Union filed a reply to Harvey's response. On March 15, 2001, the trial court entered an order that granted the Union's motion to confirm the arbitration award and denied Harvey's motion to vacate the arbitration award. On April, 11, 2001, Harvey timely filed a notice of appeal.

## ANALYSIS

### I

Harvey contends the trial court erred when it granted the Union's motion to confirm the arbitration award. Harvey maintains the arbitrator did not have proper jurisdiction to rule on the matter because Stokes failed to follow the proper procedures when he filed his grievance form. Specifically, Harvey argues that Stokes's grievance failed to set forth the reason for the grievance as required by the CBA, and consequently, the trial court should have vacated the arbitrator's decision.

The section of the CBA that details what a grievance should contain follows:

"*Step 3*

*If the grievance is not settled at Step 2, and the grievant or the Union wishes to appeal the decision to Step 3, it shall be submitted to the Mayor and/or his designee within ten (10) business days after receipt of the response at Step 2, or when a response should have been received at Step 2. The grievance shall set forth the facts and circumstances and shall state the reason for believing that the*

*grievance was improperly denied at Step 2.* The Mayor and/or his designee shall then investigate the grievance, and may hold a meeting with the parties involved in the grievance at a reasonably convenient time within ten (10) business day after receiving the grievance. The Mayor and/or his designee shall then respond to the grievance, in writing, within ten (10) business days after conducting such meeting. If the grievance is denied, or if no response is received, the Union may proceed to arbitration." (Emphasis added.)

Initially, the Union argues that Stokes filed his grievance under the expedited procedures provision of the CBA and, as such, was not required to state the nature of the grievance as required under step 2 of the CBA. In support of its argument, the Union cites section B of the CBA, which follows:

> *"Section B. Expedited Procedures.* The Union may initiate grievances concerning discharges, suspensions of more than five (5) days and denial of promotions at the third step of the grievance procedure. Whenever practicable, such grievances unresolved at the third step meeting shall be scheduled for arbitration within sixty (60) days of the third step meeting."

Also, the Union argues that there are no provisions in the CBA which provide that a grievance which fails to state that which is being grieved is defective and hence deprives the arbitrator of jurisdiction. The Union points to the fact that the CBA does not specify the effect or remedy for a procedural defect in a grievance. In support of its argument, the Union quotes language from article VII of section D of the CBA to illustrate the CBA's silence with respect to the effect of a procedural defect in a grievance. Article VII, section D of the CBA states:

> *"Section D. Limitations.* Nothing in this Agreement shall be construed as requiring the Union to process an unmeritorious grievance. The term 'business days' shall mean weekdays, Monday through Friday, exclusive of holidays. The parties may agree to an extension of any time limits provided that such agreement is in writing and signed by a representative of each party. If the Union fails to process a grievance within the required time limits, the grievance shall be considered withdrawn. If the City fails to respond to a grievance within the required time limit, the Union may regard the grievance as being denied and proceed to the next step. An arbitrator shall have no authority to: amend, modify, nullify, ignore, add to or subtract from this Agreement; or decide cases subject to Civil Service Commission jurisdiction except as set forth in Section D. Cases involving oral reprimands may be processed through the grievance procedure but shall not be taken to arbitration."

Lastly, the Union asserts that this type of procedural issue is not

jurisdictional but is rather within the exclusive and unreviewable authority of the arbitrator.

■ "This court has consistently recognized that the judicial review of an arbitral award is extremely limited. [Citations.] This standard reflects the legislature's intent in enacting the Illinois Uniform Arbitration Act—to provide finality for labor disputes submitted to arbitration. See 710 ILCS 5/12 (West 1994) (denying judicial authority to vacate arbitral awards except on grounds recognized at common law). The Act contemplates judicial disturbance of an award only in instances of fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration. [Citation.] Thus, a court is duty bound to enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective-bargaining agreement. [Citation.]

■ To this end, any question regarding the interpretation of a collective-bargaining agreement is to be answered by the arbitrator. Because the parties have contracted to have their disputes settled by an arbitrator, rather than by a judge, it is the arbitrator's view of the meaning of the contract that the parties have agreed to accept. We will not overrule that construction merely because our own interpretation differs from that of the arbitrator. [Citation.]" *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 304-05 (1996).

In *Board of Education of Posen-Robbins School District No. 143¹/₂, Cook County v. Daniels*, 108 Ill. App. 3d 550 (1982), an action was instituted by a school board for a declaratory judgment to vacate an arbitration award on a salary freeze dispute with the union representing teachers. The school board decided to impose a sanction against teachers for failing to pursue additional academic training as required by the collective-bargaining agreement. The teachers filed a grievance and the matter went to arbitration. The school board announced its decision to impose a sanction in August 1978, and the teachers filed their grievances in June 1979. One disputed issue that arose during the arbitration was the timeliness of the filing of the grievances. The collective-bargaining agreement stated:

> "The aggrieved teacher shall file the grievance in writing and at a mutually agreeable time, discuss the matter with the principal in the presence of a Union representative, if so desired, with the objective of resolving the matter. The filing of the grievance at the first stage must be within five (5) school days of the aggrieved becoming aware of the grievances." 108 Ill. App. 3d at 555.

As to the timeliness of the grievances, the arbitrator found that although the official grievances were not formally filed until June

1979, the Board was aware of the existence of the grievances from the time it began to implement its decision to sanction the teachers in the fall of 1978. In making its finding, the *Daniels* court wrote:

"Questions involving contractual time limitations are for the arbitrators, not the courts to decide. [Citation.] Such decisions usually require construing the contract in light of the customs and practices of the industry, a task peculiarly within the competence of the arbitrator. [Citation.] Moreover, since the parties have bargained for the arbitrator's construction of the agreement, the courts will not overrule the arbitrator's decision because their interpretation is different from that of the arbitrator. [Citation.] In the present case we find that the arbitrator's decision as to timeliness did not constitute a manifest disregard of the agreement between the parties so as to justify our overruling it." *Daniels*, 108 Ill. App. 3d at 555-56.

■ Here, although timeliness is not the issue, we find that this situation mirrors that in *Daniels*. Here, Stokes's grievance form clearly indicates that it is being filed at step 3 of the grievance process. Under the CBA, it appears that a grievant must set forth that which is being grieved during step 2. Questions regarding the interpretation of a collective-bargaining agreement are to be answered by the arbitrator. *Department of Central Management Services*, 173 Ill. 2d at 305. Here, the arbitrator's decision went to the interpretation of the CBA. We find that his decision was within the scope of his authority and the award draws its essence from the parties' collective-bargaining agreement. As such, we find that the trial court's decision was proper.

## II

Next, Harvey argues that the trial court erred because the arbitrator's award violates public policy. Harvey contends the arbitration award violates Illinois public policy, which mandates that an employer provide a safe workplace for its employees and eliminate known dangers. In particular, Harvey asserts Stokes's reinstatement would create an unsafe workplace at Harvey's street department and, as such, the arbitrator's decision should be vacated.

The Union asserts that the arbitration decision does not violate Illinois public policy. The Union argues that the arbitrator's decision is correct because the arbitrator took into consideration Stokes's employment history and concluded that Stokes would pose no future risk of harm and also issued Stokes a 60-day suspension to impress upon Stokes the seriousness of his actions. We agree with the Union's position on this issue.

■ "Courts have crafted a public policy exception to vacate arbitral awards which otherwise derive their essence from a collective-

bargaining agreement. The historical context of the exception is grounded in the common law. As with any contract, a court will not enforce a collective-bargaining agreement that is repugnant to established norms of public policy. Likewise, we may not ignore the same public policy concerns when they are undermined through the process of arbitration. [Citation.]

However, in order to vacate an arbitral award upon these grounds, the contract, as interpreted by the arbitrator, must violate some explicit public policy. [Citations.] In this respect, the exception is a narrow one and is invoked only when a contravention of public policy is clearly shown. [Citations.] Moreover, the public policy must be 'well-defined and dominant' and ascertainable 'by reference to the laws and legal precedents and not from generalized considerations of supposed public interests.' [Citation.] This court has stated that it will look to our 'constitution and *** statutes, and when cases arise concerning matters upon which they are silent, then in its judicial decisions and the constant practice of the government officials' when determining questions regarding public policy. [Citation.]

Thus, application of the public policy exception requires a two-step analysis. The threshold question is whether a well-defined and dominant public policy can be identified. If so, the court must determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated the public policy." *AFSCME*, 173 Ill. 2d at 306-08.

■ Harvey maintains two sources from which this court can identify Illinois public policy favoring the safety of employees in the workplace: (1) the Illinois Health and Safety Act (820 ILCS 225/1 *et seq.* (West 2000)) and (2) Illinois case law, which recognizes a cause of action for negligent retention of an employee, *i.e., Van Horne v. Muller*, 185 Ill. 2d 299 (1998). We agree.

■ Next, Harvey argues the arbitrator's findings indicate that Stokes is a danger in the workplace because he engaged in abusive and violent conduct toward his supervisor. Harvey maintains that Stokes is a violent person and that his reinstatement would create a dangerous work environment and violate Illinois public policy. The findings of the arbitrator follow:

"I find that Stokes made the threats to Knaack as alleged in Knaack's testimony. First, I find he said to Knaack: 'If you ever disrespect my mother again, I'm going to kill you.' I find that as Thurman was holding Stokes, and Knaack passed by, Stokes said, 'I'm going to kill that motherfucker'—and Knaack heard him say it. I cannot find that Stokes knew Knaack was passing by and said it for[ ] him to hear. I also find that Stokes, at the beginning of this

conflict period, did say to Knaack, 'After work, you and I are going out in the salt bin.' "

To support its argument, Harvey cited *County of De Witt v. American Federation of State, County & Municipal Employees, Council 31*, 291 Ill. App. 3d 634 (1998). In *De Witt*, a county brought an action to vacate an arbitration award that ordered the reinstatement of a nursing home employee who had been discharged for striking an elderly resident. The county argued that the award of reinstatement was against public policy.

A witness's description of the incident follows:

"Winstead [discharged employee] grabbed the glass from Tatham's [elderly resident] hand, hit her on the side of her head, and slammed the glass down in front of the other resident. The hit caused Tatham's head to move a little bit, but Zook [witness] did not think the hit was hard enough to leave a mark." *De Witt*, 291 Ill. App. 3d at 635.

The *De Witt* court found that the award was against public policy and wrote:

"[T]he arbitrator's determination that Winstead posed no threat for future abuse had no rational basis. In previous cases where an arbitrator found that the employees could be trusted to refrain from future misconduct, the employees did not deny their wrongdoing and were still punished in some way. Here, Winstead has stubbornly denied touching Tatham, even in the face of overwhelming evidence that she did, in fact, strike her. We are also concerned that some of the other Home employees may be covering up for her. Certainly, this is no clear indication that such an incident will not happen again.

Also, the arbitrator awarded complete reinstatement to Winstead, without the slightest reprimand for her behavior. Thus, he did not take any precautionary steps to deter future misconduct or to ensure it will not be repeated. [Citation.] If anything, the arbitrator's award encourages misconduct because it prevents nursing homes from terminating abusive employees unless it is proved the abuse is repetitive or results in physical injury. The arbitrator's award does not in any way promote the welfare and protection of the elderly and violates public policy." *De Witt*, 291 Ill. App. 3d at 639.

This matter can be distinguished from the *De Witt* case. Here, Stokes did not strike his employer. Instead, Stokes threatened his employer, and the arbitrator found that he did not think that this behavior would reoccur because of the "special circumstances under which [the threats] were made." The arbitrator took into consideration that Stokes only made the threats because he perceived that Knaack had disrespected his mother.

The arbitrator noted that Stokes had worked for Harvey for approximately 13 years and nothing resembling this incident had ever happened before. Stokes's employment record indicated only a very few minor disciplinary corrections in all the time that Stokes worked for Harvey. Also, the arbitrator punished Stokes for his behavior by suspending him for 60 days and not awarding back pay. A portion of the arbitrator's decision follows:

"I understand Knaack's concern, not only for himself, but for not having an 'unsafe' atmosphere. However, I do not think that Stokes's presence in the Street Department would create such an atmosphere. After all, Stokes has worke[d] there for 13 years and nothing resembling this ever happened before. His employment record shows only a very few minor disciplinary corrections in all that time. But this matter was highly unusual, involving his deep love and care for his mother. Such a situation could hardly be expected to occur again.

Accordingly[,] I find that the action of termination of Stokes was not proper or justified. However, his actions were a serious disciplinary failure. I think management has the right and duty—as does this Arbitrator—to impress on Stokes the seriousness of his failure. I think a suspension of Stokes for a period of time is called for— and I think a short period of a week or so would not make the impact required. Rather, I think a period of a sixty-day suspension, without pay, of Stokes would well have been justified by the City at the time of the misconduct—and in the AWARD below, such suspension shall have been considered to have been served at the beginning of his termination."

This case is more analogous to the *State of Illinois v. AFSCME, Council 31*, 321 Ill. App. 3d 1038 (2001), where the Department of Corrections (DOC) appealed an arbitration award reinstating a prison guard, who had been discharged for his involvement in an altercation with an inmate. The trial court confirmed the award, and the appellate court held that the arbitrator's award did not violate public policy and hence was valid.

The circumstances that led to the fight follow:

"[A]n inmate, who was walking to the dining room, turned to Mr. Henderson, the correctional officer on duty at that time and called him a 'crack head.' *** After dinner, Mr. Henderson confronted the inmate while he was playing dominos with two other inmates. Mr. Henderson asked the inmate not to call him a crack head again. A heated discussion followed. The inmate repeated his taunt. When Mr. Henderson directed him to refrain, the inmate yelled, 'fuck you crack head,' and stated, 'I have freedom of speech.' Mr. Henderson then punched the inmate in the face. The inmate returned a punch

and the fight ensued. Another inmate joined in, striking Mr. Henderson twice. Mr. Henderson fell to the floor. At that point, the fighting stopped. Eventually, a third inmate reported the incident." *AFSCME*, 321 Ill. App. 3d at 1040.

The analysis of the arbitrator's decision is provided:

"After determining that Mr. Henderson had violated rules of employment, the arbitrator turned to the issue of discipline. In reaching his decision, the arbitrator balanced aggravating and mitigating factors to determine whether a discharge was the appropriate penalty. The mitigating factors noted in the award were: (1) the employee had 16 years of seniority at the time of his discharge, (2) all of his evaluations indicated that he met expectations in all areas except attendance and, thus, was considered a good employee, (3) there was no evidence of prior personnel problems with the employee, and (4) there was no premeditation on the part of the employee. After weighing these factors, the arbitrator found that the discharge was not for just cause. He reinstated Mr. Henderson to his former position without loss of seniority but with no back pay." *AFSCME*, 321 Ill. App. 3d at 1040.

The court affirmed the decision of the trial court, and its findings follow:

"After reviewing his decision, we conclude that the arbitrator made a rational determination that Mr. Henderson was amenable to discipline. It is clear to us that in reaching this decision, the arbitrator considered the potential of the employee to repeat his offense and the risk posed to the Employer and to the inmates of the facility. The arbitrator specifically noted that throughout 16 years of service, this employee had received good evaluations, had no history of prior personnel problems, and did not plan or provoke the fight. The arbitrator indicated that if the employee did not have a proven track record, he would have sustained the discharge. Implicit in the decision is the arbitrator's consideration of the public policy against battering prisoners and thoughtful determination that Mr. Henderson was amenable to rehabilitation and that the risk that he would engage in similar incidents in the future was low. There is no requirement that the arbitrator expressly state that an employee is amenable to discipline. [Citations.] If it is clear from the award that the arbitrator made a rational finding that an employee could capably return to and perform his duties without impinging or undermining the public policy and without posing a risk to public safety and welfare and that the employee will refrain from the misconduct, the court is obligated to affirm the award." *AFSCME*, 321 Ill. App. 3d at 1042-43.

We believe this set of facts more closely follows the circumstances of this case. Here, the arbitrator made a rational finding that Stokes

could capably return to and perform his duties without creating a dangerous work environment. The arbitrator made a determination and considered the ramifications his decision would have with Illinois's public policy. As such, we affirm the trial court's decision.

## CONCLUSION

For the foregoing reasons, the trial court's decision to confirm the arbitration award is affirmed.

Affirmed.

CAMPBELL, P.J., and GREIMAN, J., concur.