2019 IL App (2d) 180375
No. 2-18-0375
Opinion filed February 21, 2019

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE CITY OF AURORA, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-MR-70 |
| | ) | |
| THE ASSOCIATION OF PROFESSIONAL | ) | |
| POLICE OFFICERS and DANIEL WAGNER, | ) | Honorable |
| | ) | David R. Akemann, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant Daniel Wagner, a police officer employed by plaintiff, the City of Aurora (City), was accused of installing and monitoring hidden surveillance cameras in his former marital home without the permission of his ex-wife, Lisa. (Wagner was never charged with a criminal offense.) The police chief, Kristen Ziman, terminated Wagner's employment, and the City, Wagner, and defendant the Association of Professional Police Officers (Union) proceeded through the grievance process to arbitration. The arbitrator found that the City had just cause to discipline Wagner but reduced the discipline to a one-year suspension without "creditable service for either Department seniority or pension purposes." The Union moved to modify the arbitrator's award, seeking a specific finding that Wagner was not likely to repeat the conduct for

which he was suspended.  In the meantime, the City sought judicial review and the arbitrator determined that he did not have jurisdiction to rule on the Union's motion.  The trial court vacated the arbitrator's award and denied defendants' motion to confirm the award or, in the alternative, to remand for a ruling on the Union's motion to modify.  The court determined that the arbitrator's award was contrary to public policy and, thus, reinstated the termination.  Defendants appeal.  We reverse the trial court and confirm the arbitrator's award.

¶ 2                                  I. BACKGROUND

¶ 3      Wagner was a patrol officer and a member of the Union.   The City and the Union are parties to a collective bargaining agreement (CBA), which provides that matters relating to suspension or discharge of nonprobationary police officers "shall be handled in accordance with the grievance procedure herein set forth."  Article XXII, section 22.22(E), of the CBA contains the grievance process, the final step of which is binding arbitration.  See 5 ILCS 315/8 (West 2016); see also 710 ILCS 5/1 *et seq.* (West 2016).

¶ 4                              A. Wagner's Interrogation

¶ 5      On November 1, 2016, Wagner was interrogated by Aurora Police Department personnel and was represented by Union counsel.  See 50 ILCS 725/3 to 3.11 (West 2016).  Wagner stated that Lisa filed for divorce in November 2015 and that the divorce was finalized on July 7, 2016.  Wagner and Lisa had two children: a six-year-old daughter and a two-year-old son.  During the divorce proceedings, Wagner lived in the marital home in Sugar Grove.  Afterward, Lisa retained the property and Wagner moved out.  However, Lisa permitted Wagner to have access to the home, to help with maintenance, the children, and the dog.

¶ 6      Wagner stated that Lisa never gave him permission to install audio-video surveillance equipment in the residence, either during the marriage or after the divorce.  He installed such

equipment in March 2016. He installed one camera in the kitchen (by the refrigerator) and two in the master bedroom (one by the dresser and one in an air vent). He and Lisa had discussions in both the kitchen and the bedroom. Wagner explained that he installed the cameras because he wanted to protect himself against any false allegations by Lisa, to protect his career, to safeguard his property, and to ensure that the children were cared for. Lisa had tried to use Wagner's job as leverage and threatened to make false allegations against him to obtain half of his pension, the house, and other property. When asked if he installed the cameras to obtain information about Lisa's personal life, Wagner denied it and reiterated his motive to protect himself against false allegations.

¶ 7    The cameras were deactivated at times but were generally activated, including after the divorce. Wagner monitored the cameras from his personal phone and occasionally from his work phone. He "probably" monitored them daily.

¶ 8    When asked if he ever had a plan to remove the cameras, Wagner stated that he would have done so when the relationship was "absolutely concluded." Postdivorce, he and Lisa had good days and bad days. Wagner conceded that he once called his daughter after overhearing a conversation between her and Lisa in the house, after he had moved out. He listened to the conversation because his daughter had contacted him through her iPad, crying and wanting to see him.

¶ 9    On September 11, 2016, Lisa discovered the cameras and Wagner received a notification that the devices were off-line. Wagner texted her, "I know what you know. We have to talk." In a text to Ron Hain, a family friend and Kane County Sheriff's Office sergeant, Wagner stated, "I don't wanna go to jail. I don't wanna lose my job." He asked Hain to ascertain what was

occurring at Lisa's house. Her family, who did not care for Wagner, was present, as were Sugar Grove police officers.

¶ 10    Wagner stated that he knew that it is a misdemeanor to place in another person's residence a device that transmits live audio, with the intent to transmit that audio without the person's consent. He also knew that it is a felony to transmit live video of a person from a person's residence without that person's consent. The use of eavesdropping devices in a secretive manner for the purpose of overhearing, transmitting, or recording all or any part of a conversation to which one is not a party, unless done with the consent of all parties involved, is also a felony. When asked if he believed that he violated any criminal statutes by installing and monitoring the cameras, Wagner replied "in hindsight yes. At that time I was—as I said before, I was using them to safeguard myself." Wagner stated that he never intended to interfere with Lisa's life. He intended to protect his children and himself.

¶ 11    During the divorce, while having heated conversations, he and Lisa would record each other with their phones.

¶ 12                                    B. Grievance Process

¶ 13    On September 11, 2016, Ziman became aware that Wagner might have been involved in off-duty misconduct at his former marital residence, and she ordered Lieutenant Mark Weeks, who was in charge of the office of professional standards, to initiate an internal investigation. Weeks collected police reports and text messages and attempted to interview Lisa. He also took Wagner's compelled statement.

¶ 14    In his report, Weeks related that, initially, Lisa cooperated with Sugar Grove police and provided a statement to an investigator. She related that Wagner moved out of the marital residence on July 8, 2016, two days after the divorce was finalized. Afterward, Lisa believed

that Wagner was aware of certain personal information that she had not shared with him. Sugar Grove police turned their investigation over to the Illinois State Police, who executed a search warrant at the residence on September 12, 2016. When Weeks attempted to obtain a statement from Lisa on September 16, 2016, she refused to cooperate.

¶ 15    Weeks found sustained the allegations of violations of certain Aurora Police Department rules (4.3.2(C), conduct and behavior; 4.3.2(F), truthfulness; and 4.3.1(A), obedience to laws).[1] Weeks stated that, although Wagner might not have had malicious or criminal intent when he installed and monitored the cameras, he was aware that he had no legal right to do so and might have violated criminal statutes. Also, he did not use sound judgment and failed to follow ordinary and reasonable rules of good conduct and behavior.

¶ 16    Subsequently, the police commander concurred with Weeks's findings and recommended a 15-day suspension for the conduct-and-behavior violation and a 15-day suspension for the obedience-to-laws violation. He found the offenses terminable but recommended suspension instead because "this situation evolved under a heavy emotional time" for Wagner, Wagner was forthcoming during his interview, and he had incurred no serious discipline during his nine-year

---

[1] The City's exhibit No. 9 lists the rules at issue. Rule 4.3.2(C) provides that "[e]mployees, whether on-duty or off-duty, shall follow ordinary and reasonable rules of good conduct and behavior and shall not commit any act in an official or private capacity tending to bring reproach, discredit, or embarrassment to their profession or the Department. Employees shall follow established procedures in carrying out their duties as employees of the Department and shall at all times use sound [judgment]." Rule 4.3.2(F) provides that "[e]mployees shall not make false or untrue statements." Rule 4.3.1(A) provides that "[e]mployees shall comply with all federal and state laws, as well as the ordinances of the City of Aurora."

tenure with the department. However, the Employee Review Board recommended termination for the obedience-to-laws violation.

¶ 17 On January 16, 2017, Ziman ordered termination of Wagner's employment. She found that Wagner admitted to surveilling Lisa on an almost daily basis and that his assertion that he did so to protect himself from false accusations by Lisa and to monitor his children's well-being was "curious," given that two cameras were in her bedroom—"an unlikely place to monitor potential 'false accusations' or his children's welfare." Ziman acknowledged that "emotions run high" during a divorce, but she could not ignore that Wagner committed a Class 4 felony by eavesdropping on Lisa. "Monitoring his ex-wife daily from both his work and personal cell phone using cameras that he installed goes beyond 'lack of judgment' or emotion. It was willful and wanton disregard for the law that [Wagner] himself has taken an oath to uphold." The human-resources director concurred in Ziman's recommendation and terminated Wagner's employment, effective January 19, 2017.

¶ 18                                     C. Arbitration Hearing

¶ 19 The arbitration hearing occurred on October 10, 2017. Three witnesses testified on the City's behalf: Weeks, Hain, and Ziman. Wagner called no witnesses.

¶ 20                                     1. Weeks

¶ 21 Weeks testified that he had worked for the Aurora Police Department for 27 years. In September 2016, Ziman informed Weeks of an incident involving Wagner and the Sugar Grove Police Department. The police had been contacted about cameras found in Lisa's house. Weeks subsequently obtained a police report, along with copies of text messages between Wagner and Hain. Weeks attempted to interview Lisa, but she refused. However, Weeks spoke with Lisa's parents, who were present on the day the cameras were found in Lisa's house.

¶ 22    On November 1, 2016, Weeks interrogated Wagner.  When Weeks asked Wagner if Lisa had given him permission after their divorce to install the cameras, Wagner replied in the negative.  Wagner never indicated that Lisa was aware of the installation.  He knew that it is a misdemeanor to place in another person's residence a device that transmits live audio, with the intent to transmit the audio without the person's consent.  Wagner also knew that it is a felony to transmit live video of a person from a person's residence without that person's consent.  When Weeks asked Wagner if he violated any criminal statutes, Wagner replied that in hindsight he did but that he was using the cameras to safeguard himself.  Wagner told Weeks where he had installed the cameras.  Wagner generally monitored the cameras daily.  He installed the cameras in March 2016, when he still lived at the home.  Lisa did not know about the cameras until September 2016.

¶ 23    In one text message to Hain, Wagner wrote, "Please stress to Lisa if I lose my job I'm done with child support.  Sorry brother I'm still just freaking out man[.]  I don't want to lose my kids[.]  I don't want to lose my job[.]  ***  They will prove it was illegal and I'm fired[.]  ***  E[]aves[]dropping[.]  ***  They will investigate and I'm fired[.]  ***  With a felony I can't even get a job[.]  [D]on't tell her that[.]"  In other texts, Wagner stated that he installed the cameras because he believed that Lisa was cheating on him and because, during the divorce, Lisa had threatened to fabricate a domestic battery or sexual assault allegation.  Wagner wanted to protect himself.

¶ 24    During the interrogation, Wagner invoked the fifth amendment, but he was ordered to answer the questions.

¶ 25                                              2. Hain

¶ 26 Hain was a sergeant at the Kane County Sheriff's Office and had worked there for 14 years. He testified that he had known Wagner since 2005, was Wagner's friend, and would like to see Wagner retain his job. He socialized with Wagner and Lisa when they were married.

¶ 27 On September 11 or 12, 2016, at about 5 p.m., Hain, who was off duty, and his wife went to the Wagner residence after Lisa contacted him. Sugar Grove police officers were present, as were Lisa's father, stepmother, sister, and brother. Lisa was upset (though her family was more upset) and told Hain that something terrible was found at the residence.

¶ 28 Lisa explained to Hain that she had told her sister that she believed that Wagner always knew what she was doing or what she had said. Lisa's sister searched online for how to locate surveillance equipment, and they then looked through the vents in the house. In Lisa's bedroom, they saw a red beam shining from a vent, took off the cover, and found a camera. Lisa showed it to Hain. Hain testified that Lisa appeared very surprised by the discovery.

¶ 29 Meanwhile, Hain and Wagner were in contact. Wagner was very upset that Lisa and her sister found the camera, and he was very apologetic that he had caused anyone duress. Hain tried to calm down Wagner. Wagner told Hain where the two additional cameras were. Hain retrieved the second camera in the bedroom and unplugged it.

¶ 30 Wagner was very concerned that the incident was going to cost him his job. He texted, "They will prove it was illegal." Police officers collected the evidence, and Hain was interviewed by state police. Later that night, Wagner told Hain that he had not monitored the cameras for a long time.

¶ 31 Ziman told Hain that she stood by her decision to terminate Wagner's employment. However, she also stated that Wagner was a good cop and that, if the arbitrator returned Wagner to his job, it would not be the worst thing to happen to the City.

¶ 32    According to Hain, Lisa's father wanted Wagner to lose his job, but Lisa did not agree. Hain's wife and Lisa were very good friends. Hain knew that Lisa had insinuated that she could make accusations about Wagner if he did not give up his pension to her in the divorce proceedings. Hain believed that, if Wagner returned to work, he would be a good police officer.

¶ 33                                    3. Ziman

¶ 34    Ziman testified that she became a police officer in 1994 and had been police chief for 22 months. Prior to the incident at Lisa's residence, Wagner had been assigned to a State police task force position involving narcotics investigations.

¶ 35    She stated that, generally, it is important that officers not engage in off-duty conduct that holds the department in disrepute. Officers who are charged with enforcing the law need to follow the law.

¶ 36    After she learned about the incident, Ziman's first thought was that Wagner's actions constituted a felony. Ultimately, after Weeks's investigation, Ziman determined that termination was warranted. Wagner was a good cop, in Ziman's view, and had no history of misconduct. However, he committed a crime and Ziman could not overlook that.

¶ 37    Addressing Wagner's statement that he did not intend to spy on Lisa but was trying to protect himself from false allegations, Ziman believed that this was odd. During the interrogation, Wagner admitted to monitoring the cameras almost daily. He also stated that he activated the cameras in July, after the divorce was final and he no longer lived at the residence. However, he had not been charged with any crimes.

¶ 38                               D. Arbitrator's Decision

¶ 39    On January 5, 2018, the arbitrator issued his decision, determining that Wagner should be suspended for one calendar year from the date of his termination. The arbitrator noted that

Wagner was charged with violating Aurora Police Department rules 4.3.2(C) and 4.3.1(A), and he also cited the eavesdropping statute (720 ILCS 5/14-1 *et seq.* (West 2016)) and a portion of the disorderly conduct statute addressing unauthorized video recording and live video transmission (*id.* § 26-4).[2]

¶ 40    The arbitrator noted the "unusual circumstances" surrounding the hearing, where Wagner was present but chose not to testify out of a concern that anything he said might be used against him in a criminal proceeding. These circumstances, according to the arbitrator, made it difficult to understand Wagner's point of view and his motivation. Also, because Lisa did not testify, it was difficult to determine whether she gave consent. Still, the arbitrator determined that Wagner installed the surveillance cameras without Lisa's knowledge or consent. As support, he pointed to her reaction when she discovered the cameras, according to Hain's testimony. "Lisa did not consent to the invasion of her privacy at any point from the time of installation to the time of discovery." Addressing Lisa's failure to press charges against Wagner and failure to appear at the hearing, the arbitrator found that to do so would have been against her children's interests. If Wagner were terminated, it would be more difficult for Wagner to meet his support obligations to the children.

---

[2] The eavesdropping statute makes it a violation for any person to use an eavesdropping device for purposes of intercepting, recording, or transcribing "in a surreptitious manner any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication." 720 ILCS 5/14-2(a)(3) (West 2016). The disorderly conduct statute proscribes "any person to knowingly make a video record or transmit live video of another person in that other person's residence without that person's consent." *Id.* § 26-4(a-5).

¶ 41    The arbitrator addressed the Union's argument that the appropriate remedy was a 15-day suspension, as recommended by the police commander.  He rejected that suggestion, noting that the Union did not call the commander to testify.

¶ 42    Summarizing, the arbitrator found that Wagner broke the law and his oath as a police officer and that Lisa decided not to press charges, based on her children's best interests.  The remedy, the arbitrator found, should be severe enough to let Wagner and the community know that such behavior is not acceptable but should also take into account the circumstances surrounding Wagner's breach of the law.  Wagner "was a nine[-]year veteran of the police force with good work evaluations for his past performance.  He was going [through] a difficult divorce and his emotions may have clouded his judgment."  Termination, the arbitrator determined, would be "too harsh a remedy here."  Accordingly, he ordered that Wagner be suspended for one calendar year from the date of his termination and that the suspension term not be considered creditable service for either department seniority or pension purposes.

¶ 43    On January 15, 2018, the Union filed a motion with the arbitrator to modify the award, seeking a finding that Wagner was not likely to repeat the conduct for which he was suspended. *City of Des Plaines v. Metropolitan Alliance of Police, Chapter No. 240*, 2015 IL App (1st) 140957.  It attached to its motion a copy of Ziman's January 5, 2018, text message to Wagner:

> "Hi Dan, it's Kristen.  I'm sure you heard the news of the Arbitrator's ruling.
> Congratulations.  Sincerely.
> Are you able to call DC Jackson, Commander Cross and I at [number]?
> We are attempting to work through logistics since shift picks have already posted and want to include you on that discussion.
> ***

We want to make sure we get you squared away!"

¶ 44                    E. Trial Court Proceedings

¶ 45    On January 18, 2018, the City filed in the trial court a complaint for declaratory relief and to vacate the arbitration award, arguing that the award violated clearly established public policies requiring special accountability of police officers for their off-duty conduct and prohibiting gross invasions of privacy. The City asserted that Wagner's employment should be terminated.

¶ 46    On January 31, 2018, the arbitrator denied the Union's motion to modify the arbitration award, finding that he no longer had jurisdiction because the City's suit was pending in the trial court. See 710 ILCS 5/9 (West 2016). Addressing the recidivism issue, the arbitrator noted that it was never raised during the arbitration hearing. However, he added, "I did cover his experience as a police officer on the Aurora Police force for nine years and his record over that period in the award report. I did note that his offenses involved a difficult period in his life, going through a divorce with his wife."

¶ 47    Subsequently, after the City refused to allow Wagner to report for duty on January 18, 2018, defendants filed in the trial court a motion to maintain the status quo. On March 16, 2018, the trial court denied the motion. Defendants also filed in the trial court a motion to confirm the arbitrator's award or, alternatively, to remand for a ruling on the Union's motion to modify.

¶ 48    On May 3, 2018, the trial court determined that the arbitrator's decision was against public policy and it vacated the decision and confirmed the City's decision to terminate Wagner's employment. The court found significant the arbitrator's determination that Wagner installed the cameras without Lisa's knowledge or consent and that this activity constituted an invasion of her privacy from the time of installation to the time of discovery. The court also noted that the arbitrator made no finding as to whether in the future Wagner would refrain from

the offending conduct. Applying the relevant two-part test, the court first determined that there is a clear public policy against invasions of privacy or interceptions of communication by eavesdropping devices or other means (see Ill. Const. 1970, art. I, § 6; 720 ILCS 5/14-2, 26-4 (West 2016); *Orsa v. Police Board of the City of Chicago*, 2016 IL App (1st) 121709 (concerning police officers' accountability for their off-duty conduct)). As to the second question—whether the arbitrator's reinstatement of Wagner violated that public policy—the court found that the answer depended on whether the arbitrator made a rational finding that Wagner could be trusted to refrain from the offending conduct upon his reinstatement. Because the arbitrator made no such finding, the court determined that Wagner's reinstatement would violate public policy.

> "It is difficult to construe a greater violation of privacy than a continuous live stream of audio and visual of a person's bed and bedroom without that person's knowledge and consent. This activity, which the grievant knew to be unlawful and in derogation of his sworn oath, ran largely unabated for 5-6 months constituting an egregious violation of domestic privacy."

The court further determined that, in the absence of the "required finding," the arbitrator's decision must be vacated. The court explained that case law did not require a remand for a recidivism finding by the arbitrator and that a remand would not be fruitful in this case, because the record contained no "testimony from witnesses that would permit the arbitrator to make such a determination" (a reference to the fact that Wagner elected not to testify at the arbitration hearing). The court vacated the arbitrator's decision, confirmed the City's termination of Wagner, and denied defendants' motion to enter judgment on the arbitrator's award. Defendants appeal.

- 13 -

¶ 49                              II. ANALYSIS

¶ 50    Defendants argue that the trial court erred in vacating the arbitrator's decision.  They maintain that the arbitrator's award did not violate public policy and that, alternatively, the trial court erred in denying their request to remand the case to the arbitrator for a recidivism finding. For the following reasons, we agree that the arbitrator's award did not violate public policy and that the arbitrator implicitly considered the likelihood that Wagner would reoffend.

¶ 51                 A. Standard of Review and Public-Policy Exception

¶ 52    Judicial review of an arbitrator's award is "extremely limited" and reflects the legislature's intent in enacting the Uniform Arbitration Act (710 ILCS 5/1 *et seq.* (West 2016)) to provide finality for labor disputes submitted to arbitration.  *American Federation of State, County & Municipal Employees v. State* (*AFSCME*), 124 Ill. 2d 246, 254 (1988); see 710 ILCS 5/12 (West 2016) (where arbitration involves a collective bargaining agreement, a court will disturb the arbitration award only on the common-law grounds that existed prior to enactment of statute).  "The Act contemplates judicial disturbance of an award only in instances of fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration." *American Federation of State, County & Municipal Employees v. Department of Central Management Services* (*DuBose*), 173 Ill. 2d 299, 304 (1996).  "[A] court is duty bound to enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective bargaining agreement."  *Id.* at 304-05. "Because the parties have contracted to have their disputes settled by an arbitrator, rather than by a judge, it is the arbitrator's view of the meaning of the contract that the parties have agreed to accept."  *Id.* at 305.  A court will not overturn an arbitrator's construction of a collective

bargaining agreement merely because its own interpretation differs from that of the arbitrator. *Id.*

¶ 53    However, courts have recognized a public-policy exception to vacate arbitration awards that are based on collective bargaining agreements. *Id.* at 306. To vacate an arbitration award on this ground:

> "[T]he contract, *as interpreted* by the arbitrator, must violate some explicit public policy. [*AFSCME*, 124 Ill. 2d at 261; *W.R. Grace & Co. v. Local Union 759, International Union of the Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 766 (1983). In this respect, the exception is a narrow one and is invoked only when a contravention of public policy is clearly shown. [*AFSCME*, 124 Ill. 2d at 261, citing *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987))] Moreover, the public policy must be 'well-defined and dominant' and ascertainable 'by reference to the laws and legal precedents and not from generalized considerations of supposed public interests.' [*W.R. Grace*, 461 U.S. at 766.] This court has stated that it will look to our 'constitution and *** statutes, and when cases arise concerning matters upon which they are silent, then in its judicial decisions and the constant practice of the government officials' when determining questions regarding public policy. *Zeigler v. Illinois Trust & Savings Bank*, 245 Ill. 180, 193 (1910)." (Emphasis in original.) *Id.* at 307.

¶ 54    Application of the public-policy exception is a two-step process. *Id.* The first inquiry is whether a well-defined and dominant public policy can be identified, and, if so, then the next question is whether the arbitrator's award, as reflected in his or her interpretation of the agreement, violated that public policy. *Id.* at 307-08.

¶ 55    The ultimate applicability of the exception is necessarily fact-dependent. *Id.* at 311. However, we review *de novo* whether an arbitrator's decision violates public policy. *Des Plaines*, 2015 IL App (1st) 140597, ¶ 20 (further noting that, in *DuBose*, although the supreme court did not explicitly set forth a standard, its analysis appeared to apply *de novo* review).

¶ 56    *AFSCME* and *DuBose* are the two most relevant supreme court cases analyzing the public-policy exception. In *AFSCME*, the supreme court held that the arbitrator did not violate public policy when he reinstated and suspended two Department of Mental Health and Developmental Disabilities (Department) employees who were absent from work without permission. *AFSCME*, 124 Ill. 2d at 263. The employees were technicians at a facility that provided care and treatment for profoundly mentally disabled residents. On a day when the facility was short-staffed, the employees were authorized to go to a grocery store to purchase food for an impromptu barbeque for the residents that afternoon. *Id.* at 250. After shopping for groceries for 30 minutes, the employees made an unauthorized trip to a flea market for 1¼ hours. During their absence, a male resident died while left unattended. The employees were not assigned to the resident's wing. Pursuant to Department rules and regulations and facility policy, the employees were discharged for conduct constituting mistreatment of a service recipient. *Id.* at 251.

¶ 57    The arbitrator reduced the discipline to four-month suspensions, finding that the employees admitted wrongdoing and expressed remorse, had exemplary work histories, treated the residents as though they were family, provided straightforward and truthful testimony at the arbitration hearing, and were unlikely to repeat the conduct upon reinstatement. *Id.* at 251-52. The trial court vacated the arbitrator's award, finding that it violated the public policy of

protecting mental health patients. *Id.* at 252. The appellate court, in turn, reversed the trial court, determining that the arbitrator's award did not violate that public policy, because the employees were suspended for four months without back pay or benefits. *Id.* at 252-53.

¶ 58 The supreme court first addressed the Department's argument that the arbitrator exceeded his authority by considering mitigating factors in reducing the discipline to suspensions. *Id.* at 253. It held that he did not exceed his authority, because the collective bargaining agreement did not mandate discharge but provided four types of disciplinary measures that could be imposed upon a finding of just cause. *Id.* at 257-59.

¶ 59 Next, the court addressed the public-policy exception and acknowledged the public policy of providing compassionate care for the mentally disabled, but it also noted the policies of promoting constructive public-employer and public-employee relationships and finality of arbitration awards. *Id.* at 262. The court then held that the parties' collective bargaining agreement, as interpreted by the arbitrator, did "not violate any explicit public policy" that was "well-defined and dominant." *Id.* at 262-63. The court concluded that no policy mandated the discharge of the employees when the arbitrator expressly found that the employees were otherwise exemplary, punishment had been imposed, and there was no nexus between the infraction and the death. *Id.* at 263. The court specifically noted that the employees' did not abuse or injure any resident. *Id.*

¶ 60 Finally, the supreme court addressed the arbitrator's explicit finding that the employees were not likely to repeat their conduct. *Id.* at 263-65. The court held that, in light of this finding, the award was not against public policy (on the basis that it posed a danger to third persons). Rather, the award drew its essence from the collective bargaining agreement, which provided for

progressive and corrective discipline. *Id.* at 264. The court upheld the arbitrator's finding that the conduct at issue was serious enough to warrant suspension. *Id.* at 264-65.

¶ 61    In *DuBose*, the court reached a different result. In that case, a Department of Children and Family Services (DCFS) child welfare specialist falsely stated that she had seen three children and that they were doing fine. In fact, the children had died in an accidental fire one month earlier. An investigation revealed that the employee had also failed to submit case plans for the family for three years. *DuBose*, 173 Ill. 2d at 301. DCFS discharged the employee, and the arbitrator reinstated her, finding that DCFS breached the collective bargaining agreement by failing to timely discipline the employee. The arbitrator did not decide whether DCFS lacked just cause to discharge the employee. *Id.* at 302. The trial court vacated the arbitrator's award, finding that reinstatement violated public policy as stated in the neglected-child reporting statute, and remanded the matter for a decision on the merits. *Id.* at 302-03. On remand, the union stood on its timeliness argument and did not address the merits. The arbitrator thus denied the grievance. The trial court denied the union's petition to confirm the initial award reinstating the employee. Ultimately, the appellate court held that the initial award upheld the agreement's essence and could not be vacated in favor of the public policy of establishing time frames for commencing various actions. *Id.* at 303.

¶ 62    The supreme court reversed the appellate court, holding that the arbitrator violated the public policies of providing truthful and accurate reporting and of employing of honest and diligent individuals. The arbitrator based his ruling on violations of the agreement's time provision, which did not allow for exigent disciplinary circumstances, without considering the nature of the employee's conduct or finding that the welfare of children supervised by DCFS would not be compromised by the reinstatement. *Id.* at 317-18. Specifically, the court first

pointed to "the comprehensive legislative scheme designed for the welfare and protection of children found to be abused or neglected" and concluded that there was a well-defined and dominant public policy against DCFS's employing dishonest and neglectful individuals, who could seriously undermine the welfare, safety, and protection of children. *Id.* at 315-16. This policy, the court noted, augmented the policy of timely contact with children "and accurate documentation of investigations necessary for DCFS to fulfill its legislative mandate of investigating claims of suspected child abuse and neglect." *Id.* at 316-17.

¶ 63    Second, the supreme court held that the arbitrator's award violated public policy because it did not promote the welfare and protection of children. *Id.* at 318. By agreeing to a time provision that did not allow for exigent disciplinary circumstances, DCFS compromised its ability to discharge its statutory duties. *Id.* The court rejected the union's position that, because no statute expressly prohibited hiring a dishonest worker, there was no public-policy violation. *Id.* at 319-20. The court determined that the statutes presupposed that only trustworthy workers would be hired. *Id.* at 321. The court also disagreed with the union's position that overturning the initial award ignored the agreement. *Id.* at 322. The court noted that its holding did not restrain an arbitrator from imposing an appropriate remedy within the agreement's confines. *Id.* "[A]s long as the arbitrator makes a rational finding that the employee can be trusted to refrain from the offending conduct, the arbitrator may reinstate the employee to his or her former job, and we would be obliged to affirm the award." *Id.* However, the court continued, the arbitrator's freedom in fashioning an appropriate remedy is not unlimited. *Id.* at 323. "Where, as here, an arbitrator awards full reinstatement as a remedy for the contractual violation without any findings that the worker poses no risk to the welfare and protection of DCFS's children and their families, the award simply cannot stand. *** [T]he full measure of the arbitrator's

discretion must always yield to public policy." *Id.* The court distinguished *AFSCME* by noting that there it had upheld the arbitrator's reinstatement because the arbitrator had made an express finding concerning the employees' amenability to discipline, "a factual determination which cannot be questioned or rejected by a reviewing court." *Id.* at 331-32 (noting arbitrator's findings that employees had good work histories, punishment had been imposed, and there was no nexus between the infraction and the death). The *DuBose* court also cited several cases in which courts vacated arbitrators' reinstatement awards for various forms of egregious misconduct. *Id.* at 308-10; see *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, International*, 861 F.2d 665, 674 (11th Cir. 1988) (termination of pilot who flew commercial airliner while intoxicated; court noted employer's duty to prevent employee from violating clear legal standards; collective bargaining agreement, as interpreted by arbitrator, violated public policy); *Iowa Electric Light & Power Co. v. Local Union 204 of the International Brotherhood of Electrical Workers*, 834 F.2d 1424, 1429 (8th Cir. 1987) (nuclear power plant employee who had safety device disconnected so that he could go to lunch violated strict federal nuclear-regulatory scheme and, thereby, jeopardized public safety and could not be reinstated consistently with that policy); *United States Postal Service v. American Postal Workers Union*, 736 F.2d 822, 825 (1st Cir. 1984) (postal worker terminated for embezzling postal funds; offense went to heart of his responsibilities and violated public trust placed in postal branch); *Board of Education of School District U-46 v. Illinois Educational Labor Relations Board*, 216 Ill. App. 3d 990, 1003-06 (1991) (school-bus driver fired for unsafe driving violated well-defined and dominant public policy favoring safe transportation of school children).

¶ 64    Thus, as this court recently summarized:

"[P]roving a violation of public policy requires more than making a plausible argument that the public will suffer some sort of harm from the enforcement of an arbitration award. *** [I]n cases *** in which awards were overturned on public-policy grounds, the awards amounted to condoning blatant and specific violations of established policies and in effect to enabling future violations by employees who had demonstrated their proclivities to gross unfitness or illegality. The possibility of harm arising indirectly from the enforcement of the award appears to be insufficient, even if it is possible to state that this harm is contrary to some sort of general public policy or public interest." *Illinois State Toll Highway Authority v. International Brotherhood of Teamsters, Local 700*, 2015 IL App (2d) 141060, ¶ 63.

¶ 65    With this background in mind, we turn to the public-policy exception's applicability in this case.

¶ 66                    1. Is There A Well-Defined and Dominant Public Policy?

¶ 67    Our first inquiry is whether there is a well-defined and dominant public policy. *DuBose*, 173 Ill. 2d at 307-08. In their reply brief, defendants concede that public policy is implicated in a case, such as this, involving misconduct by a police officer. They point to Wagner's admission that he violated general orders in regard to misconduct in his personal life, outside of his official duties. The City points to the following sources of the policies implicated in this case: (1) the Illinois Constitution (Ill. Const. 1970, art. I, § 6[3]), (2) criminal statutes addressing eavesdropping

---

[3] "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, *invasions of privacy or interceptions of communications by eavesdropping devices or other means*. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the

and unauthorized video recording (720 ILCS 5/14-2, 26-4 (West 2016)), (3) invasion-of-privacy case law (*e.g.*, *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 35 (recognizing tort of intrusion upon seclusion)), (4) the policy requiring special accountability of police officers for their off-duty conduct (see, *e.g.*, *Orsa*, 2016 IL App (1st) 121709, ¶¶ 63-64), and (5) police department rule 4.3.2(C) (concerning conduct and behavior).

¶ 68    This first question is easily resolved.  We agree with the parties that there is a well-defined and dominant public policy in favor of holding police officers accountable for their off-duty conduct, as set forth in criminal statutes and police department rules, and against invasions of privacy, as set forth in our constitution and case law.

¶ 69                    2. Did the Arbitrator's Award Violate Public Policy?

¶ 70    The second question is whether the arbitrator's award, as reflected in his interpretation of the CBA, violated public policy.  Defendants argue that the City did not make such a showing. They assert that, although the found that Wagner had engaged in off-duty misconduct, the remedy should take into account the circumstances surrounding it.  The arbitrator, defendants note, specifically determined that Wagner had a good work history, that he was going through a difficult divorce, and that emotions might have clouded his judgment.  Defendants also argue that the City did not specify what conduct requires termination and that the CBA provides for progressive and corrective discipline.

¶ 71    Defendants urge that, in the absence of a rule mandating termination, courts have *declined to find* that reinstatement violates public policy when some punishment was imposed and the employee's work performance was otherwise satisfactory but *have found* that reinstatement violates public policy when a comprehensive statutory scheme delineated the

---

persons or things to be seized." (Emphasis added.)  Ill. Const. 1970, art. I, § 6.

employee's duties or where no punishment was imposed. Compare *AFSCME*, 124 Ill. 2d at 262-64 (acknowledging policies of providing compassionate care for mentally disabled and promoting constructive relationships between public employers and public employees, but concluding that no policy mandated discharge where employees had exemplary work records, punishment had been imposed, and there was no nexus between the infraction and the death; further concluding that reinstatement did not violate public policy where arbitrator found that employees would not likely repeat their misconduct), and *City of Harvey*, 333 Ill. App. 3d at 677-80 (although there is a policy favoring employees' safety in the workplace, reinstatement of employee who assaulted supervisor did not violate the policy where arbitrator found that behavior would not likely recur, employee had long work history and good disciplinary record, and employee was punished with suspension and no back pay), with *DuBose*, 173 Ill. 2d at 313-15 (examining DCFS's role in implementing comprehensive legislative scheme to identify the public policy implicated in the case), and *County of De Witt v. American Federation of State, County & Municipal Employees*, 298 Ill. App. 3d 634, 634-39 (1998) (county operating nursing home terminated nurse's aide with long and exemplary work history who allegedly struck an elderly resident in the head; collective bargaining agreement provided for immediate discharge of employees who abused residents; reviewing court held that arbitrator's reinstatement of employee—based on finding that striking "may have" occurred and that, even if it did, employee merely brushed side of resident's head—violated public policy of protecting the elderly from abuse, which tolerates no incidents of abuse, no "matter how infrequent or mild"; further holding that arbitrator's finding that employee would pose no threat of future abuse was not rational where employee denied wrongdoing "even in the face of overwhelming evidence that she did," other employees might have covered up for her and no witness testified that striking was

accidental or a brushing, and arbitrator awarded complete reinstatement with no reprimand to deter future misconduct).

¶ 72    Defendants also note that reinstatement can be upheld even where the employee violated public policy.  Specifically, in *State v. AFSCME* (*AFSCME Council 31*), 321 Ill. App. 3d 1038, 1041-43 (2001), the Fifth District held that the arbitrator's reinstatement of a correctional officer, who had a good work history but initiated the use of force against an inmate by punching him in the face, did not violate public policy.  The court first determined that it was undisputed that there is a policy against battering prisoners.  *Id.* at 1041 (citing 730 ILCS 5/1-1-2(c) (West 1992)).  Next, it concluded that the reinstatement did not violate that policy where no contractual provision required termination and the arbitrator made a rational finding that the employee was amenable to discipline.  *Id.* at 1042.  The arbitrator noted that the employee had a long work history, good evaluations, and lack of prior discipline and that he did not provoke the fight with the inmate.  *Id.*  Further, the court noted the implicit finding that the employee was amenable to rehabilitation and that the risk of future incidents was low.  *Id.*  Here, defendants argue that the CBA provides for arbitral discretion concerning discipline and that a one-year suspension thus was within the arbitrator's purview under the agreement.  Further, they note that the City has not identified any authority mandating termination for objectionable off-duty behavior.

¶ 73    The City relies on *Decatur Police Benevolent & Protective Ass'n Labor Committee v. City of Decatur*, 2012 IL App (4th) 110764, where the reviewing court affirmed the trial court's finding that the arbitrator's award of reinstatement violated public policy.  *Id.* ¶ 44.  In *Decatur*, a police officer's wife alleged that, during an argument, her husband pushed her onto their bed, " 'got in her face,' " and, after she pushed him away, " 'head-butted' " her above her nose.  *Id.* ¶ 5.  A police investigator's report stated that, at the scene, the officer had denied that there was

any physical contact. After the investigator spoke to the wife, the officer was arrested. *Id.* ¶ 6. The following morning, the officer was interviewed at police headquarters and stated that any injury to his wife resulted from her striking him in the forehead with her face and nose. *Id.* ¶ 7. The officer had received awards and commendations for his police work (*id.* ¶ 4) but had also previously—about four months before the incident at issue—been disciplined for domestic battery, which resulted in a 30-day suspension and an order to participate in an employee-assistance program (*id.* ¶ 8). The arbitrator determined that the proper penalty was a 45-day suspension, instead of termination. He noted that no order or finding stated that the officer committed domestic battery (*id.* ¶ 11) and he determined that there was no clear and convincing evidence of battery. He ruled that, although the officer admitted making untruthful statements, they provided an insufficient basis for termination. *Id.* ¶¶ 13-14. The trial court set aside the arbitrator's award, finding that it violated the public policy against acts of domestic violence and for law enforcement officers to be truthful during police investigations. *Id.* ¶¶ 15-16. The reviewing court affirmed, holding that there is a public policy against acts of domestic violence, including by a police officer, whether on- or off-duty. *Id.* ¶ 44. The court also concluded that employing an officer who has been found, by a preponderance of the evidence, to be abusive and untruthful is against public policy. *Id.*

¶ 74 The City maintains that Wagner's conduct was much more egregious than that in *Decatur*. It contends that, contrary to the arbitrator's finding that he was going through a difficult divorce and that emotions might have clouded his judgment, he used the surveillance cameras to spy on Lisa *after* the divorce was finalized. Further, he installed two of the cameras in her bedroom, allowing him to spy on her most intimate activities from the convenience of his personal—and, sometimes, work-issued—phone. The City notes that Wagner continued to

monitor the cameras long after the divorce, until he was caught. The City also maintains that Wagner was dishonest during his interrogation, when, although he acknowledged that his actions were criminal, he stated that he used the cameras only to safeguard himself. It asserts that, because Wagner was divorced when he used the cameras, his safeguarding defense was a lie. It also asserts that defendants' reliance on *AFSCME Council 31* is misplaced because the employee's actions there were not nearly as egregious as Wagner's repeated criminal and tortious acts, which rose to the level of violating public policy.

¶ 75    We conclude that the arbitrator's award did not violate public policy. There was no contractual provision mandating termination of police officers for off-duty misconduct, and the arbitrator, in our view, made a rational finding that Wagner was amenable to discipline. See *AFSCME Council 31*, 321 Ill. App. 3d at 1042. The CBA contemplates various forms of discipline, specifically noting removal, suspension, and discharge as possible measures for findings of cause. The arbitrator noted that the remedy had to be severe enough that Wagner and the community knew that his behavior was not acceptable, but that it also had to take into account the circumstances. Specifically, the arbitrator noted Wagner's long work history, his good work performance, and the fact that he was going through "a difficult divorce and his emotions may have clouded his judgment." The arbitrator specifically found that termination would be too harsh and, instead, ordered a one-year suspension, which would not be considered creditable service for department seniority or pension purposes. As this summary of the arbitrator's findings shows, he fashioned an award that considered the seriousness of Wagner's acts but also the mitigating circumstances of the case, such as Wagner's work history and the divorce. "[A]n employee's amenability to discipline is a factual determination which cannot be questioned or rejected by a reviewing court." *DuBose*, 173 Ill. 2d at 331-32 (distinguishing

*AFSCME* on the basis that the arbitrator in that case expressly found certain mitigating factors and imposed punishment).

¶ 76    We agree with defendants that *Decatur*, upon which the City relies, involved more egregious circumstances than this case.  In *Decatur*, the Fourth District held that the arbitrator's award, reinstating a police officer who had assaulted his wife, violated public policy.  *Decatur*, 2012 IL App (4th) 110764, ¶ 44.  The officer denied the allegations of physical contact, fabricated an alternative scenario, and, critically, had previously been disciplined for domestic battery.  Here, the City points to the fact that Wagner used the surveillance cameras after the divorce was finalized and in Lisa's bedroom.  Wagner's safeguarding defense, in the City's view, was a lie because he continued to use the cameras after the divorce.  However, once Wagner's scheme was discovered, he did not deny it or fabricate another scenario, as did the officer in *Decatur*.  Although we agree that the safeguarding defense is somewhat questionable, Hain did testify to certain threats that Lisa had made concerning Wagner's pension, and Wagner and Lisa did hold discussions in the bedroom.  Further, Wagner had not been previously disciplined for the same conduct, as had the *Decatur* officer.  Finally, we note that Lisa did not give a statement or testify and, thus, as defendants note, she did not dispute Wagner's version of the events.

¶ 77    We believe that this case is more like *City of Harvey* and *AFSCME Council 31*, where the reviewing courts held that reinstatement did not violate public policy, because the arbitrators had assessed the employees' work histories and had imposed punishments that contemplated the employees' amenability to discipline.  The City contends that *City of Harvey* is distinguishable because the employee's behavior in that case—threatening his supervisor—was not nearly as egregious as Wagner's behavior in this case.  We disagree with the City's characterization of

*City of Harvey*. In fact, the employee in that case assaulted his supervisor, and the reviewing court upheld the arbitrator's reinstatement of the employee, as he had a long work history and a good disciplinary record and was punished, and the arbitrator found that he would not likely repeat the offensive conduct. *City of Harvey*, 333 Ill. App. 3d at 677-80.

¶ 78    We also reject the City's argument that the arbitrator's finding that the difficult divorce might have clouded Wagner's judgment is conclusory and has no factual basis. The City notes that Wagner did not testify during the arbitration hearing. However, the text messages between Wagner and Hain reflected not only that emotions ran high when Lisa discovered the cameras and contacted the police, but also that Lisa's family did not hold Wagner in high esteem and that the couple still had an emotional relationship. Further, Wagner's interrogation reflected that some of the circumstances of the divorce were unusual, in that Wagner had frequent access to the former marital home and continued to help Lisa with some domestic chores. From these facts, the arbitrator could reasonably have found heightened emotions.

¶ 79    In summary, the arbitrator's award did not violate public policy.

¶ 80                                    B. Remand

¶ 81    Wagner argues next, in the alternative, that, if we do not affirm the arbitrator's award, we should remand this case to the arbitrator for a recidivism finding. Even though we affirm the arbitrator's award, we choose to address this argument, because, as we explain below, the arbitrator implicitly considered the issue.

¶ 82    Wagner argues that the trial court's failure to remand violated *Des Plaines*, 2015 IL App (1st) 140957, ¶ 39. In *Des Plaines*, a police officer was accused of using excessive force against four arrestees over two years and failing to report that conduct pursuant to department rules. *Id.* ¶ 1. The city sought to terminate the officer, and the arbitrator determined that, although the

officer violated certain rules, termination was not warranted, because the city had delayed in investigating the allegations and the police department had condoned his conduct. *Id.* ¶¶ 11-13. The arbitrator determined that reinstatement was appropriate, without back pay, benefits, or accumulated seniority, along with other conditions. *Id.* ¶ 14. The trial court vacated the arbitration award, finding that it violated public policy, and it denied the union's motion to remand to the arbitrator for findings concerning the officer's likelihood of engaging in the same misconduct following reinstatement. *Id.* ¶ 15. The First District held that there is a well-defined and dominant "public policy against police officers unnecessarily using force against prisoners and being dishonest about that use of force during a subsequent investigation." *Id.* ¶ 24 (citing cases). Next, the court assessed whether the reinstatement violated that policy, noting that the arbitrator had found that the officer used unnecessary force and was untruthful about his actions but had made no finding concerning the likelihood of recidivism. *Id.* ¶ 25. The absence of a recidivism finding, the court held, precluded determining whether the arbitration award violated public policy. *Id.* Although case law supported the notion that an *implicit* finding may suffice, the court concluded that the award in the case before it was "ambiguous on this point." *Id.* It noted that the arbitrator did not make *any* finding related to recidivism, *such as regarding the officer's work history, character, disposition for violence, or rehabilitative potential.* *Id.* ¶ 26. Instead, the award was based on the city's delay in investigating the incidents and the department's condonation of the conduct. *Id.* The court further noted that case law supported a remand where a court requires clarification of ambiguities in the arbitrator's findings. *Id.* ¶¶ 37-38 (citing cases). Concluding that the award was "incomplete, or at least ambiguous," the court determined that a remand was necessary. *Id.* ¶¶ 39-41 (further noting that *DuBose* "explicitly

recognizes that arbitrators can, and indeed should, make such a determination" and distinguishing case law that did not address whether remand was warranted).

¶ 83    Here, defendants acknowledge that the arbitrator made no explicit finding that, if Wagner were reinstated, he would refrain from the offending conduct in the future.  However, defendants argue first that the unique nature of Wagner's conduct renders a repeat offense impossible. Second, defendants point to Ziman's text that it would not be the worst thing for the City if Wagner were reinstated, Hain's testimony that Wagner was a good police officer, and the arbitrator's finding that Wagner's judgment was clouded during his divorce.  Defendants also note that, although Wagner did not testify at the arbitration hearing, his interrogation showed that he was truthful and forthcoming and did not have the requisite intent to violate the criminal statutes.

¶ 84    The City's position is that a remand is not warranted, because the nature of the conduct here is so egregious that reinstatement violates public policy.  It also argues that a remand would not be fruitful, because Wagner did not testify and, therefore, there is no basis upon which the arbitrator could make a recidivism finding.  Specifically, the City argues that *Des Plaines* is irrelevant here because that case rested on a procedural question; there was no finding, implicit or explicit, as to the likelihood of recidivism.  Also, the City contends that, in *Des Plaines*, the officer's conduct related to an act that he was generally authorized to perform—the use force. Here, the City urges, Wagner's conduct was morally reprehensible, intrinsically wrong, and clearly illegal.  The City maintains that an officer who plants hidden cameras in his ex-wife's house to watch her in her bedroom clearly does not have the morals or respect for the law needed for the role of police officer.  The City argues that case law distinguishes between questionable conduct at work and conduct involving moral turpitude, and it asserts that this case falls in the

latter category. See *DuBose*, 173 Ill. 2d at 333 ("[W]hen public policy is at issue, it is the court's responsibility to protect the public interest at stake. That is why courts will not give the drunken pilot the opportunity to fly a commercial airliner again even though no harm befell his passengers."); see also *Chicago Transit Authority v. Amalgamated Transit Union, Local 241*, 399 Ill. App. 3d 689, 698-702 (2010) (arbitrator's reinstatement of bus driver after authority terminated him upon discovering that he had been convicted of aggravated criminal sexual abuse of his stepdaughter violated public policy in favor of safe and secure transportation of the public, especially children; driver had not completed treatment, failed several polygraphs, had not taken his final polygraph, and, during his employment, was serving a four-year probation term and was a registered sex offender, both of which he hid from the authority).

¶ 85    We conclude that the arbitrator implicitly found that Wagner was unlikely to reoffend. We affirm that finding, and, therefore, a remand is not warranted. See *DuBose*, 173 Ill. 2d at 332 (where an arbitrator has expressly or by implication determined that an employee can be rehabilitated and thus is not likely to commit an act that violates public policy in the future, " 'a court would be hard-pressed to find a public policy barring reinstatement' " (quoting *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200, 1213 (9th Cir. 1989))). The arbitrator specifically noted that Wagner was a nine-year veteran of the police force, with good performance evaluations but was going through a "difficult divorce and his emotions may have clouded his judgment." The arbitrator thus determined that termination would be too harsh and ordered a one-year suspension. These findings reflect that the arbitrator considered the circumstances of this case and implicitly found that Wagner was unlikely to commit similar misconduct in the future. This case is more like *AFSCME Council 31*, which upheld an implicit finding (*AFSCME Council 31*, 321 Ill. App. 3d at 1042-43 (holding that

arbitrator made rational implicit finding that employee was amenable to discipline and that the risk of future incidents was low, where arbitrator noted that the employee had long work history, good evaluations, and lack of prior discipline and that he did not provoke the fight with the inmate)) than *Des Plaines*, where the court determined that the arbitrator's findings were ambiguous (*Des Plaines*, 2015 IL App (1st) 140957, ¶¶ 37-41 (holding that the award was "incomplete, or at least ambiguous" and that remand was necessary)).[4] Accordingly, a remand is not warranted.

¶ 86    Finally, we note again that, before the arbitrator had ruled on the Union's motion to modify the award to include a recidivism finding, the City sought judicial review of this case. The parties agree that the arbitrator lost jurisdiction to rule on the motion when the City filed its complaint in the trial court. Indeed, the arbitrator agreed. In his January 31, 2018, order denying the motion, he found that he no longer had jurisdiction because the City's suit was pending in the trial court. See 710 ILCS 5/9 (West 2016). We need not resolve the jurisdictional issue. Whether or not the arbitrator had jurisdiction to resolve the recidivism issue, there is no prejudice, because, as we hold above, he had already implicitly considered it.

¶ 87                                    III. CONCLUSION

¶ 88    For the reasons stated, the judgment of the circuit court of Kane County is reversed and the arbitrator's decision is confirmed.

¶ 89    Circuit court judgment reversed.

---

[4] We agree with *Des Plaines* to the extent that it concludes that, where a record does *not* indicate that recidivism was determined, the trial court should remand the case to the arbitrator for further findings.